1  Adam Steinbaugh, Cal. Bar No. 304829
   FOUNDATION FOR INDIVIDUAL RIGHTS
2    AND EXPRESSION
3  510 Walnut Street, Suite 900
   Philadelphia, PA 19106
4  Telephone:   (215) 717-3473
   Email:        adam@thefire.org
5
   JT Morris, Tex. Bar No. 24094444*
6  Zachary T. Silver, D.C. Bar No. 1742271*
   FOUNDATION FOR INDIVIDUAL RIGHTS
7    AND EXPRESSION
8  700 Pennsylvania Avenue, SE; Suite 340
   Washington, D.C. 20003
9  Telephone:   (215) 717-3473
   Email:        jt.morris@thefire.org
10 Email:        zach.silver@thefire.org

11 David Loy, Cal. Bar No. 229235
   David Snyder, Cal. Bar No. 262001
12 FIRST AMENDMENT COALITION
13 534 4th Street, Suite B
   San Rafael, CA 94901-3334
14 Telephone:   (415) 460-5060
   Email:        dloy@firstamendmentcoalition.org
15 Email:        dsnyder@firstamendmentcoalition.org

16
   *Attorneys for Plaintiffs*
17 * Pro hac vice *application pending.*

18          **UNITED STATES DISTRICT COURT**
19      **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
           **SAN FRANCISCO DIVISION**
20

21 FIRST AMENDMENT COALITION,          Civil Case No. 3:24-cv-08343-TSH
   VIRGINIA LAROE, and EUGENE
22 VOLOKH,                             **FILED UNDER SEAL**

23                  Plaintiffs,        **PLAINTIFFS' NOTICE OF MOTION**
                                       **AND MOTION FOR PRELIMINARY**
24          v.                         **INJUNCTION**

25 DAVID CHIU, in his official capacity as
   City Attorney of San Francisco; and ROB   Date: January 2, 2025
26 BONTA, in his official capacity as         Time: 10:00 A.M.
   Attorney General of California,           Dept.: Courtroom E – 15th Floor
27
                   Defendants.
28

_____
MOTION FOR PRELIMINARY INJUNCTION

**TO THE COURT, THE PARTIES, AND ALL ATTORNEYS OF RECORD:**

Under Fed. R. Civ. P. 65 and Civ. L.R. 7-1, PLAINTIFFS FIRST AMENDMENT COALITION, VIRGINIA LAROE, and EUGENE VOLOKH move for a preliminary injunction. This motion will be heard at the date and time above or as soon as the Court may hear it.

Plaintiffs ask this Court to issue a preliminary injunction prohibiting Defendants David Chiu and Rob Bonta, in their official capacities, from enforcing California Penal Code section 851.92(c), which prohibits any person from "disseminat[ing] information relating to a sealed arrest," including information lawfully obtained from public sources. Each violation is subject to a civil penalty of up to $2,500.

There is good cause to grant the motion. In recent weeks, the San Francisco City Attorney has repeatedly threatened to enforce the provision against those who publish or discuss the contents of a sealed incident report documenting the arrest of a high-profile tech CEO—a report the CEO claims the San Francisco Police Department made public by releasing it in response to a public records request. Plaintiffs—a First Amendment advocacy group, its advocacy director, and a legal commentator—want to engage in protected expression barred by the statute, including public advocacy and publication of articles concerning efforts by the CEO and government officials to suppress the publication of information about his arrest.

The statute is a content-based restriction on speech, failing strict scrutiny because it is not narrowly tailored to advance a compelling government interest. The statute obligates the public—including journalists, commentators, victims of crime, and witnesses—to keep the government's secrets. The First Amendment forbids that result, and the Court should enjoin Defendants from enforcing the provision.

DATED: November 25, 2024                      Respectfully submitted,

                                              By: /s/ Adam Steinbaugh
                                                  Adam Steinbaugh
                                                  FOUNDATION FOR INDIVIDUAL
                                                      RIGHTS AND EXPRESSION
                                                  Attorney for Plaintiffs

1

## <u>**TABLE OF CONTENTS**</u>

2  INTRODUCTION ...................................................................................................... 1

3  BACKGROUND ...................................................................................................... 2

4      A tech CEO's effort to attract business from intelligence agencies draws
       scrutiny from journalists. ............................................................................. 3

5

6      The San Francisco Police Department shares Blackman's sealed arrest
       report, which Blackman attempts to suppress. ............................................ 4

7      The San Francisco City Attorney repeatedly threatens to use California's anti-
       dissemination statute for sharing information about the arrest. ................. 5

8

9      Plaintiffs, who regularly comment on censorship, intend to republish or
       discuss the report—the same speech the City Attorney is targeting. ......... 6

10 STATEMENT OF ISSUES TO BE DECIDED ................................................... 7

11 ARGUMENT ........................................................................................................... 8

12  I.   Plaintiffs Are Likely to Show the Anti-Dissemination Statute Violates the
            First Amendment. ...................................................................................... 8

13

14      A.   The statute is a presumptively unconstitutional content-based
                restriction on speech. ....................................................................... 9

15

16      B.   The statute fails strict scrutiny because California's asserted
                interest in reputation does not serve a compelling interest. ............... 10

17      C.   The anti-dissemination statute fails strict scrutiny because it is not
                the least restrictive means or narrowly tailored. .............................12

18

19           i.   In reaching lawfully obtained information, the law crosses
                     clear lines set forth by the Supreme Court. ...........................13

20           ii.  The statute is overinclusive, reaching beyond consumer
                     reporting agencies and ignoring means to exempt
                     publishers. ............................................................................14

21

22           iii. The statute is underinclusive because it exempts those
                     responsible for safeguarding sealed records. ..........................17

23

24  II.  Plaintiffs Are Experiencing Irreparable Harm in the Absence of
            Preliminary Injunctive Relief. ..................................................................17

25  III. Injunctive Relief Serves the Public Interest and the Balance of Harms
            Tips in Plaintiffs' Favor. ..........................................................................18

26 CONCLUSION .....................................................................................................19

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

### <u>Cases</u>

3

*Baca v. Moreno Valley Unified Sch. Dist.,*
    936 F.Supp. 719 (C.D. Cal. 1997)...................................................19

4

*Bartnicki v. Vopper,*
    532 U.S. 514 (2001) .................................................... 1, 8, 10, 13

5

*Brandenburg v. Ohio,*
    395 U.S. 444 (1969).................................................................16

6

*Briggs v. Eden Council for Hope & Opportunity,*
    969 P.2d 564 (Cal. 1999)...........................................................14

7

8

*Butterworth v. Smith,*
    494 U.S. 624 (1990)..................................................................11

9

*Counterman v. Colorado,*
    600 U.S. 66  (2023)..................................................................16

10

*Cox Broad. Corp. v. Cohn,*
    420 U.S. 469 (1975)..................................................................14

11

12

*CTIA – The Wireless Ass'n v. City of Berkeley,*
    928 F.3d 832 (9th Cir. 2019)........................................................18

13

*Cuviello v. City of Vallejo,*
    944 F.3d 816 (9th Cir. 2019)........................................................18

14

*Elrod v. Burns,*
    427 U.S. 347 (1976)..................................................................17

15

16

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,*
    82 F.4th 664 (9th Cir. 2023)........................................................18

17

*Fla. Star v. B.J.F.,*
    491 U.S. 524 (1989) ............................................................ *passim*

18

19

*Garrison v. Louisiana,*
    379 U.S. 64 (1964) ...................................................................11

20

*Holt v. Hobbs,*
    574 U.S. 352 (2015)..................................................................12

21

*IMDb.com v. Becerra,*
    962 F.3d 1111 (9th Cir. 2020) ........................................... 8, 11, 12

22

23

*Janus v. AFSCME, Council 31,*
    585 U.S. 878 (2018)....................................................................7

24

*Johnson v. Couturier,*
    572 F.3d 1067 (9th Cir. 2009)......................................................18

25

26

*Landmark Commc'ns, Inc. v. Virginia,*
    435 U.S. 829 (1978)......................................................... 1, 11, 17

27

*Meinecke v. City of Seattle,*
    99 F.4th 514 (9th Cir. 2024)................................................ 8, 12, 18

28

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012)...................................................................18

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) ...........................................................................15

*N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ...........................................................................11

*Nken v. Holder,*
    556 U.S. 418 (2009) ...........................................................................18

*Preminger v. Principi,*
    422 F.3d 815 (9th Cir. 2005) ..............................................................18

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ................................................................... 8, 9, 10

*Republican Party v. White,*
    536 U.S. 765 (2002) ...........................................................................17

*Sable Commc'ns of Cal., Inc. v. FCC,*
    492 U.S. 115 (1989) .............................................................................9

*San Diego Unified Sch. Dist. v. Yee,*
    30 Cal. App. 5th 723 (2018) ...............................................................15

*Smith v. Daily Mail Publ'g Co.,*
    443 U.S. 97 (1979) ..................................................................... 9, 10, 11

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011)........................................................................9, 16

*United States v. Playboy Ent. Grp., Inc.,*
    529 U.S. 803 (2000)........................................................................9, 12

*United States v. Stevens,*
    559 U.S. 460 (2010) ...........................................................................10

*Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gomez,*
    834 F.3d 110 (1st Cir. 2016).................................................................14

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) .............................................................................9

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)..................................................................................8

*Worrell Newspapers of Ind. v. Westhafer,*
    739 F.2d 1219 (7th Cir. 1984) ...........................................................9, 13

**Statutes**

Cal. Gov't Code
    § 6208.1(b)(3)....................................................................................15
    § 6218(b)(3) ......................................................................................15
    § 12952(a)(3)(A)................................................................................16

Cal. Lab. Code
    § 432.7(g)(3) .....................................................................................15

Cal. Penal Code
    § 851.92 (d)(4) ...................................................................................17
    § 851.92(a) ........................................................................................ 2
    § 851.92(b)(3) ................................................................................ 3, 5
    § 851.92(b)(4) ................................................................................... 3
    § 851.92(b)(5) ................................................................................... 3
    § 851.92(c) ................................................................................ *passim*
    § 851.92(d)(3) .................................................................................16
    § 11143 ...........................................................................................15

**Other Authorities**

Aaron Tang & Fred O. Smith Jr., *Can Unions Be Sued for Following the Law?*,
    132 Harv. L. Rev. F. 24 (2018) ..................................................... 7

Byron Tau, *App Taps Unwitting Users Abroad to Gather Open-Source
    Intelligence*, Wall St. J.,  June 24, 2021 ......................................... 3

Byron Tau, *Means of Control* (2006) ................................................... 4

Byron Tau, *Premise Mobile-Phone App Suspends Ukraine Activities After
    Accusations Fly*, Wall St. J., Feb. 26, 2022 .................................... 4

Jack Poulson, *CEO of Gig-Work Surveillance Firm Resigns*, All-Source
    Intelligence, Dec. 17, 2023 .............................................................. 5

Jack Poulson, *Premise Data Confirms Secret Military and Intelligence Contracts
    in Court Filing*, All-Source Intelligence, Sept. 1, 2023 .................. 4

Jack Poulson, *The Covert Gig-Work Surveillance CEO Arrested for Felony
    Domestic Violence*, All-Source Intelligence, Sept. 14, 2023 .......... 4

Keith Griffith, *Gig-Work App Premise is Sending Its Unwitting Users to Gather
    Intelligence for the US Military*, Daily Mail,  June 27, 2021 ......... 4

Louise Matsakis, *California-Based App Premise Battles Accusations of Helping
    Russian Military*, NBC News, Feb. 26, 2022 ................................. 4

Maury Blackman, *Premise's Response to Allegations of Influence in Ukraine*,
    Premise, Feb. 25, 2022 .................................................................... 3

Sean Captain, *Meet the Ex-Googler Who's Exposing the Tech-Military Industrial
    Complex*, Fast Company, Oct. 8, 2021 ........................................... 4

William Baude & Eugene Volokh, *Compelled Subsidies and the First
    Amendment*, 132 Harv. L. Rev. 171 (2018) .................................. 7

**Rules**

Federal Rule of Civil Procedure 65(c) ..................................................18

**Regulations**

2 Cal. Code Regs. 12264.....................................................................17

Nat'l Sec. Adjudicative Guidelines, Sec. Exec. Agent Directive 3 (effective June 8,
    2017) ................................................................................................ 4

# **INTRODUCTION**

Time and again, the Supreme Court has struck down states' misguided attempts to forbid publishing lawfully obtained information about matters of public concern. When the "State attempts the extraordinary measure of punishing truthful publication in the name of privacy," the First Amendment requires the government to show it is justified by an interest of the "highest order." *Fla. Star v. B.J.F.*, 491 U.S. 524, 533, 540 (1989). That tall order is not satisfied even by weighty considerations like encouraging rape victims to contact police or discouraging wiretapping. *See, e.g.*, *id.* at 534 (name of a rape victim); *Bartnicki v. Vopper*, 532 U.S. 514, 534–35 (2001) (broadcast of phone call known to have been recorded unlawfully); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 838 (1978) (information about the investigation of a judge). Once a publisher has obtained information in a lawful manner, even if a source obtained it unlawfully, the government may not "punish the ensuing publication of that information based on a defect in the chain." *Bartnicki*, 532 U.S. at 528.

Cal. Penal Code § 851.92(c) is another such law that ignores the Court's First Amendment precedents. The content-based statute prohibits almost anyone from "disseminat[ing] information" in any way "relating" to sealed arrest reports, on pain of civil penalty. Journalists, free speech and transparency advocates, crime victims, and witnesses are just some of the many persons and entities that Section 851.92(c) manages or threatens to silence.

Recently, the City Attorney of San Francisco has wielded Section 851.92(c) to deter accurate reporting on Maury Blackman, a prominent tech executive closely tied to intelligence agencies. After a journalist lawfully obtained a sealed police report about Blackman's 2021 domestic violence arrest, the tech CEO enlisted the San Francisco City Attorney to help suppress reporting on it. At his behest, the City Attorney is threatening to enforce Section 851.92(c) against those who publish or discuss the police report.

Those threats have forced commentators and publishers to self-censor. One of those is Plaintiff Eugene Volokh, a legal commentator and journalist who publishes the *Volokh*

*Conspiracy*, a well-read blog covering the First Amendment, court system abuses, and public access to court records. Volokh wants to republish the arrest report and write about Blackman's lawsuit against the journalist, which necessarily includes "information relating to" the sealed arrest. The issue is also within the wheelhouse of Plaintiffs First Amendment Coalition ("FAC") and its Advocacy Director, Virginia "Ginny" LaRoe. FAC is a San Rafael-based nonprofit working to protect press freedom and the people's right to know. FAC and LaRoe seek to advance FAC's mission by discussing—in the press, on FAC's own website, and in public letters to lawmakers or other officials—Blackman's efforts as an example of risks to press freedom and transparency. But Section 851.92(c) and the City Attorney's threats have led or will lead each Plaintiff to self-censor.

At its core, Section 851.92(c) provides officials an unbounded tool to silence almost *anyone* sharing lawfully obtained information about newsworthy arrests. And as the City Attorney's threats highlight, officials can enforce the statute to discriminate against those who publish sealed arrest information unkind to the government or influential persons. In all cases, stifling the exercise of a core First Amendment right is no compelling government interest. Strict scrutiny dooms this content-based law.[1]

Without an immediate injunction, Section 851.92(c) and the City Attorney's threats will keep chilling not only Plaintiffs, but also journalists, advocates, scholars, victims, witnesses, and many others who publish and comment on arrests of public concern. For these reasons, the Court should enjoin Defendants from enforcing Section 851.92(c) with respect to the dissemination of lawfully obtained information about a sealed arrest.

## **BACKGROUND**

California allows arrestees to petition state courts to seal records about arrests that cannot lead to a conviction due to acquittal, passage of time, or completion of a diversionary program. Cal. Penal Code § 851.92(a). That statute requires law-enforcement agencies to

---

[1] In addition to the law's inability to withstand strict scrutiny, alone enough to justify relief, it is also facially overbroad, reaching speech beyond any legitimate sweep. And it is hopelessly vague, leaving speakers to guess what information is secret or related to a sealed arrest.

stamp such records "SEALED: DO NOT RELEASE OUTSIDE OF THE CRIMINAL JUSTICE SECTOR" and prohibits the agencies from sharing a sealed record with anyone other than the arrestee to whom it pertains or with certain government actors. *Id.* §§ 851.92(b)(3)–(5). Enforcement of that prohibition, however, extends to civil penalties of up to $2,500 on *any* person—except the arrestee and government agencies and employees, including those that maintain the records—who "disseminates information relating to a sealed arrest." *Id.* § 851.92(c) (the "anti-dissemination statute"). And the statute expressly allows Defendants—a city attorney and the Attorney General—to enforce that civil penalty. *Id.*

### *A tech CEO's effort to attract business from intelligence agencies draws scrutiny from journalists.*

Premise Data's app paid users, "many of them in the developing world, to complete basic tasks for small payments," such as "snapping photos" or gathering information, often used for marketing purposes.[2] But the company wasn't turning a profit. So Premise brought on a new CEO, Maury Blackman, a well-known executive experienced in selling technology services to governments. His plan was to turn the app's users—often in areas of conflict like Iraq or Afghanistan—into intelligence agents. As the *Wall Street Journal* reported, he "pushed to pursue more intelligence and military contracts" and Premise "stepped up its presence in Washington," adding employees who—like Blackman—had security clearances and intelligence community connections.[3]

That practice proved controversial, particularly when Ukraine's government accused Premise (erroneously) of facilitating Russian intelligence during its invasion.[4] Blackman's rocky tenure drew international media coverage from NBC News, the *Wall Street Journal*,

---

[2] Byron Tau, *App Taps Unwitting Users Abroad to Gather Open-Source Intelligence*, Wall St. J., June 24, 2021, https://www.wsj.com/articles/app-taps-unwitting-users-abroad-to-gather-open-source-intelligence-11624544026.

[3] *Id.*; Decl. of Adam Steinbaugh ("Decl. Steinbaugh"), ¶ 13, Ex. 9 at ¶ 4.)

[4] Maury Blackman, *Premise's Response to Allegations of Influence in Ukraine*, Premise, Feb. 25, 2022, *archived at* https://web.archive.org/web/20220227004420/https://www.premise.com/blog/premises-response-to-allegations-of-influence-in-ukraine.

and the *Daily Mail*.[5] And journalist Byron Tau's recent book on the intersection of Silicon Valley and the intelligence community dedicated a chapter to Blackman's transformation of Premise Data, which now draws most of its income from western intelligence agencies.[6]

***The San Francisco Police Department shares Blackman's sealed arrest report, which Blackman attempts to suppress.***

Blackman and Premise also caught the attention of journalist and researcher Jack Poulson, who publishes on relationships between Silicon Valley and intelligence agencies.[7] Poulson covered Premise's acknowledgment, during litigation against ex-employees, of its "clients in the military and intelligence sectors" and of Blackman's security clearance.[8] As with anyone else holding a security clearance, Blackman must self-report arrests because adversaries can threaten national security by exploiting embarrassing arrests.[9] In September 2023, Poulson reported that Blackman had been "arrested for alleged felony domestic violence against his 25-year-old girlfriend, but the charges were later dropped."[10]

---

[5] Louise Matsakis, *California-Based App Premise Battles Accusations of Helping Russian Military*, NBC News (Feb. 26, 2022), https://www.nbcnews.com/news/us-news/mobile-app-battles-questions-helping-russian-military-rcna17839; Byron Tau, *Premise Mobile-Phone App Suspends Ukraine Activities After Accusations Fly*, Wall St. J., Feb. 26, 2022, https://www.wsj.com/livecoverage/russia-ukraine-latest-news-2022-02-26/card/premise-mobile-phone-app-suspends-ukraine-activities-after-accusations-fly-8FDnhZe9raunaIJ4HV66; Keith Griffith, *Gig-Work App Premise is Sending its Unwitting Users to Gather Intelligence for the US Military*, Daily Mail, June 27, 2021, https://www.dailymail.co.uk/news/article-9730275/Gig-work-app-Premise-getting-users-gather-intelligence.html.

[6] Byron Tau, *Means of Control* 221–235 (2006).

[7] Sean Captain, *Meet the Ex-Googler Who's Exposing the Tech-Military Industrial Complex*, Fast Company, Oct. 8, 2021, https://www.fastcompany.com/90682901/meet-the-ex-googler-whos-exposing-the-tech-military-industrial-complex.

[8] Jack Poulson, *Premise Data Confirms Secret Military and Intelligence Contracts in Court Filing*, All-Source Intelligence, Sept. 1, 2023, https://jackpoulson.substack.com/p/premise-data-confirms-secret-military.

[9] *See* Nat'l Sec. Adjudicative Guidelines, Sec. Exec. Agent Directive 3 at G(2)(c) (effective June 8, 2017), https://www.dni.gov/files/NCSC/documents/Regulations/SEAD-3-Reporting-U.pdf.

[10] Jack Poulson, *The Covert Gig-Work Surveillance CEO Arrested for Felony Domestic Violence*, All-Source Intelligence, Sept. 14, 2023, https://jackpoulson.substack.com/p/the-covert-gig-work-surveillance.

In doing so, Poulson published a redacted copy of the incident report, which he had obtained lawfully, "unsolicited from a confidential source." (Decl. Steinbaugh ¶ 12, Ex. 8 at ¶ 5.) Blackman alleges that the San Francisco Police Department released the report in response to a public records request. (*Id*. ¶ 10, Ex. 6 at ¶¶ 44–45.) Poulson had no reason to know the report was sealed. (*Id*. ¶ 12, Ex. 8 at ¶ 6.) He communicated with the San Francisco Police Department, which verified its authenticity, without informing him it was sealed. (*Id*.) And the report did not bear the mandatory stamp indicating it was sealed. (*Id*.; *see* Cal. Penal Code § 851.92(b)(3) (requiring agencies to stamp "SEALED: DO NOT RELEASE" on incident reports).)

After the San Francisco Police released the report and Poulson published it, Blackman resigned from Premise.[11] On October 3, 2024—over a year after Poulson's publication—Blackman anonymously sued Poulson and Substack, the company that hosts his website, in the San Francisco Superior Court. (Decl. Steinbaugh ¶ 10, Ex. 6.) Blackman alleged Poulson violated the anti-dissemination statute both by publishing the report and by publishing a "description of" its "contents." (*Id*. at ¶¶ 21, 25, 166–171.)

***The San Francisco City Attorney repeatedly threatens to use California's anti-dissemination statute for sharing information about the arrest.***

Blackman also enlisted the Office of the City Attorney of San Francisco, headed by Defendant David Chiu, to assist him. (Decl. Steinbaugh ¶¶ 5, 7, 11 & Exs. 1, 3, 7.) The Office of the City Attorney obliged, sending three letters demanding that Poulson and Substack censor any posts about the report under threat of enforcement of the anti-dissemination statute. (*Id*. ¶¶ 6, 8–9 & Exs. 2, 4–5.) The City Attorney first pressured Substack, which hosts Poulson's publication, to remove posts about Blackman, sending a letter dated September 19, 2024, stating it had "come to our office's attention" that the arrest report "as well as its contents" was "published in multiple postings on your website." (*Id*. ¶ 6, Ex. 2.) The letter

---

[11] Jack Poulson, *CEO of Gig-Work Surveillance Firm Resigns*, All-Source Intelligence, Dec. 17, 2023, https://jackpoulson.substack.com/p/ceo-of-gig-work-surveillance-firm.

warned that the City Attorney "expect[ed]" the removal of "the document and its contents" within four days, "[p]ursuant to" the anti-dissemination statute. (*Id.*)

Soon, Blackman personally reached out to Deputy City Attorney Jennifer Choi to encourage "continued efforts in notifying Substack." (*Id.* ¶ 7, Ex. 3 at 3.) On October 3, the same day Blackman sued Poulson and Substack, Choi sent Substack a second letter, complaining that its "inadequate" response fell short, again demanding removal of not only the incident report but also of "posts *related to* the Incident Report." (*Id.* ¶ 9, Ex. 5 at 1.) (emphasis added). That same day, Choi also sent Poulson's attorney a letter "[p]ursuant to" the anti-dissemination statute warning Poulson that "we expect" removal of the report "and its contents" from the internet "immediately." (*Id.* ¶ 8, Ex. 4.) The next day, Blackman's attorney emailed Choi, sharing his "hope that your office will continue to help us in our efforts to enforce these various laws designed to protect Mr. Blackman." (*Id.* ¶ 11, Ex. 7 at 1.)

***Plaintiffs, who regularly comment on censorship, intend to republish or discuss the report—the same speech the City Attorney is targeting.***

Plaintiff First Amendment Coalition ("FAC") is a San Rafael-based nonpartisan public-interest nonprofit dedicated to protecting and promoting a free press, freedom of expression, and the people's right to know. (Decl. of Virginia LaRoe ("Decl. LaRoe") ¶ 6.) FAC advocates—through public commentary and advocacy, such as letters to lawmakers and other officials—for expressive freedom. (*Id.* ¶¶ 7–8.) Plaintiff Virginia "Ginny" LaRoe, FAC's Advocacy Director, wants to bring public attention to Blackman's campaign to censor coverage of his arrest. (*Id.* ¶¶ 3, 18–20, 24–26, 29–30, 33.) In addition to an opinion piece published in a San Francisco newspaper, FAC and LaRoe want to send public letters, including an open letter (which contains more information about the arrest report than the opinion piece) criticizing the San Francisco City Attorney. (*Id.* ¶¶ 24–25.) They also want to send public letters to lawmakers, post on social media, and comment in media interviews about the same information targeted by the San Francisco City Attorney. (*Id.* ¶ 26.)

Plaintiff Eugene Volokh is a Senior Fellow at Stanford University's Hoover Institution and a Professor of Law Emeritus at UCLA School of Law. (Decl. of Eugene Volokh ("Decl.

Volokh") ¶¶ 3–4.) He specializes in the First Amendment and related topics, and courts and academics frequently cite his commentary. (*Id.* ¶ 5.[12]) For over twenty years, he has published a legal blog, the *Volokh Conspiracy*, where he writes about First Amendment issues, particularly those relating to access to government records, defamation, and anonymous litigants. (*Id.* ¶¶ 6, 9–11.) He frequently documents efforts to "disappear" content from the internet using the legal system, including through court orders and defamation actions. (*See, e.g.*, *id.* ¶¶ 9–11.) Blackman's recent efforts—in league with the City Attorney of San Francisco—to suppress and sue over public information about his arrest are the sorts of things that Volokh would routinely write about. (*Id.* ¶ 13.)

The public benefits from informed commentary on the legal system and its use, particularly uses designed to frustrate public knowledge about influential figures. Yet Volokh —a California attorney who does not want to violate the Penal Code—cannot write about Blackman's censorship campaign, or the San Francisco City Attorney's support of it, let alone republish the publicly available report, without "disseminating" information "relating to" Blackman's sealed arrest. (Decl. Volokh ¶¶ 23–27.) FAC and LaRoe face the same obstacle to discussing Blackman's campaign, which is the type of censorship FAC exists to oppose. (Decl. LaRoe ¶¶ 18–20, 24–32.) In sum, the statute's existence and the City Attorney's threats to enforce it are both chilling each Plaintiff from expression they would ordinarily publish or speak.

### STATEMENT OF ISSUES TO BE DECIDED

1.     Are Plaintiffs entitled to a preliminary injunction prohibiting enforcement of California Penal Code § 851.92(c) on the basis that the law's prohibition on the dissemination of any "information" related to a sealed arrest is a content-discriminatory measure that fails strict scrutiny?

---

[12] *See also, e.g.*, *Janus v. AFSCME, Council 31*, 585 U.S. 878, 944 (2018) (Sotomayor, J., dissenting); Aaron Tang & Fred O. Smith Jr., *Can Unions Be Sued for Following the Law?*, 132 Harv. L. Rev. F. 24 (2018) (responding to William Baude & Eugene Volokh, *Compelled Subsidies and the First Amendment*, 132 Harv. L. Rev. 171 (2018)).

## ARGUMENT

The Court should grant Plaintiffs a preliminary injunction because (1) they are likely to succeed on the merits; (2) they will suffer irreparable harm absent injunctive relief; (3) the balance of equities tips in their favor; and (4) an injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). And in First Amendment cases, the balance shifts dramatically. Because Plaintiffs make "a colorable claim that [their] First Amendment rights have been infringed, or are threatened with infringement" under Penal Code Section 851.92, "the burden shifts to the government to justify the restriction on speech." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024)

But Defendants cannot show the content-based statute withstands First Amendment scrutiny. Without exception, the Supreme Court has invalidated government efforts to punish those who lawfully obtain and publish information of public concern the government deems sensitive. *E.g.*, *Fla. Star*, 491 U.S. at 541; *Bartnicki*, 532 U.S. at 534–35. And because the anti-dissemination statute irreparably harms the First Amendment rights of Plaintiffs and others to publish information "related to" sealed arrests, those "serious First Amendment questions . . . alone compel[] a finding that the balance of hardships tips sharply in [Plaintiffs'] favor." *Meinecke*, 99 F.4th at 526 (quotation marks omitted).

The Court should thus enjoin Defendants from enforcing Penal Code § 851.92(c).

## I.     Plaintiffs Are Likely to Show the Anti-Dissemination Statute Violates the First Amendment.

Both as applied to Plaintiffs and on its face as to everyone who disseminates lawfully obtained information about sealed arrests, the anti-dissemination statute violates the First Amendment as a presumptively unconstitutional content-based speech restriction that cannot withstand strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see also IMDb.com v. Becerra*, 962 F.3d 1111, 1120 (9th Cir. 2020) (prohibition on "dissemination of one type of speech: 'date of birth or age information'" was a content-discriminatory restriction on a category of speech). This is all the more so given binding Supreme Court precedent protecting dissemination of lawfully obtained information, *see United States v.*

---

*Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000) (citing *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989)), and holding that penalizing dissemination as pertains to sealed arrests is not the least restrictive means to achieve a compelling state interest. *See Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 105 (1979) (other states had "found other ways of accomplishing the objective" of protecting the identity of juvenile offenders).

### A.    The statute is a presumptively unconstitutional content-based restriction on speech.

The anti-dissemination statute regulates speech in covering only "disseminat[ing] information" and is content-based in reaching only speech "relating to a sealed arrest." Cal. Penal Code § 851.92(c). The "dissemination of information [is] speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). That is especially so as to publishing lawfully obtained information about public issues, like a tech executive's arrest that is relevant to the public debate about technology industry ethics, and that could even jeopardize national security interests. As the Supreme Court held decades ago, a state may not "punish publication" of "lawfully obtain[ed]" "truthful information about a matter of public significance," such as information about an arrestee. *Daily Mail Publ'g Co.*, 443 U.S. at 101, 103; *see also, e.g.*, *Worrell Newspapers of Ind. v. Westhafer*, 739 F.2d 1219, 1221–25 (7th Cir. 1984) (striking down as overbroad a statute prohibiting any person from disclosing the existence of a sealed indictment before the defendant is arrested).

The anti-dissemination statute is an "obvious" content-based regulation. *Reed*, 576 U.S. at 163–64. By barring "dissemination of information relating to a sealed arrest," Cal. Penal Code § 851.92(c), it targets speech "by particular subject matter"—*i.e.*, information *about* the subject of an arrest record—and makes "reference to the content of the regulated speech" to determine the law's application. *Reed*, 576 U.S. at 163–64 (quoting, in part, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Plaintiffs' chilled speech illustrates the statute's operative focus on content. If Volokh publishes a blog post on any subject, the City Attorney must read its content to ascertain whether it shares "information relating to" Blackman's sealed arrest. If FAC or LaRoe inform the public or government officials about

the free speech implications of Blackman's lawsuit, an official would have to determine whether the speech detailed anything "related to" the sealed arrest. Because the anti-dissemination statute is a content-based restriction on Plaintiffs' speech, it is presumptively unconstitutional as applied to them. *See Reed*, 576 U.S. at 163.

It is also presumptively unconstitutional on its face. By its content-based terms, the statute penalizes disseminating lawfully obtained information about sealed arrests in an extensive number of its applications. True enough, the statute also covers those who disseminate information about sealed arrests they obtained through independently unlawful means. But more predominantly, the anti-dissemination statute punishes *only* what the First Amendment protects—publishing lawfully obtained information about matters of public concern. *See Daily Mail Publ'g Co.*, 443 U.S. at 104. And as detailed next, penalizing that range of protected expression cannot survive constitutional scrutiny because it is facially unconstitutional as to a substantial amount of the dissemination of lawfully obtained information. *See United States v. Stevens*, 559 U.S. 460, 482 (2010) (a law will be "invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep'" (citation omitted)).

**B.    The statute fails strict scrutiny because California's asserted interest in reputation does not serve a compelling interest.**

Being presumptively unconstitutional, the anti-dissemination statute triggers strict scrutiny, but Defendants cannot meet the heavy burden of showing the law is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163 (citations omitted). First, as the statute "punishes publication" of "lawfully obtain[ed,] truthful information about a matter of public significance," Defendants must show "a need to further a state interest of the highest order," *Daily Mail Publ'g Co.*, 443 U.S. at 103, with a showing "far stronger than mere speculation about serious harms" or "[u]nusual" incidents. *Bartnicki*, 532 U.S. at 531–32 (citation omitted). And they must overcome the fact that the Supreme Court has never upheld a comparable regulation even where there were far weightier interests, such as encouraging rape victims to come forward and limiting publicity to the names of youthful

offenders, than those California identified in enacting the law. *Fla. Star*, 491 U.S. at 534 (name of rape victim); *Daily Mail Publ'g Co.*, 443 U.S. at 99–104 (youthful offenders).

In enacting the statute, California sought to "remove barriers [to] employment and housing opportunities" that an arrest history might pose. (Decl. Steinbaugh ¶ 14, Ex. 10 at 7 [California Senate Judiciary Committee legislative analysis].) Because "background checks conducted by consumer reporting agencies" are the primary "way information of arrests generally finds its way into the hands of potential employers, housing providers, and other decision makers," the Legislature sought to "[p]rovid[e] restraints on consumer reporting agencies" by imposing the anti-dissemination statute's civil penalty. (*Id.* at 9.)

But any governmental interest in remedying harm to an individual's reputation— whether directly or because of economic reasons—takes a constitutional backseat to the First Amendment right to share truthful information of public concern. "[R]eputational interests" do not "justify the proscription of truthful speech." *Butterworth v. Smith*, 494 U.S. 624, 634 (1990). Likewise, the desire to prevent employment discrimination does not generally justify restricting truthful speech about people. *See IMDb*.com, 962 F.3d at 1125–26. Here, the anti-dissemination statute *targets* truthful statements—the fact of an arrest or the existence of a sealed record—to avoid downstream economic harm. But the First Amendment does not permit the State to privilege the reputation of a person—whether a public official, public figure, or purely private person—over the dissemination of truthful statements of public concern. *Landmark Commc'ns*, 435 U.S. at 841–42 (injury to "official reputation" of judges); *cf. N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (public officials must show falsity and actual malice); *Garrison v. Louisiana*, 379 U.S. 64, 72 & n.8, 74 (1964) (absolute defense of truth in connection with any "public affairs").

The Supreme Court's decision in *Florida Star v. B.J.F.* illustrates why California's interests here fall short of being of the "highest order." In *Florida Star*, the Supreme Court invalidated a finding of civil liability against a newspaper for publishing the name of a rape victim obtained from a publicly released police report. 491 U.S. at 526. The story concerned only the victim's report, not an arrest or trial. *Id.* at 527, 532. The Court found that the First

Amendment protected the newspaper's truthful report and that "investigation of a violent crime which had been reported to the authorities" was a "matter of public significance." *Id.* at 536–37. In doing so, it recognized that "the privacy of victims of sexual offenses," risks to their "physical safety . . . if their names become known to their assailants[,] and the goal of encouraging victims" to come forward were "highly significant interests"—but these interests did not amount to a compelling "need" to punish the publication. *Id.* at 537.

Compared to the privacy of a rape victim involuntarily thrust into the legal system, speculation about potential economic harm from disclosure of a sealed arrest rings hollow. That's especially so here, where officials have rushed to the defense of a high-profile CEO. Because the anti-dissemination statute does not serve a compelling state interest, it cannot survive strict scrutiny, and the Court should enjoin it.

**C.    The anti-dissemination statute fails strict scrutiny because it is not the least restrictive means or narrowly tailored.**

Even if the anti-dissemination statute served a compelling interest, it still fails strict scrutiny because Defendants cannot make the "exceptionally demanding" showing that it is the "least-restrictive means" to meet that interest. *Meinecke*, 99 F.4th at 525 (quoting *Holt v. Hobbs*, 574 U.S. 352, 364 (2015)). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy Ent. Grp.*, 529 U.S. at 813 (citation omitted). Under strict scrutiny, "[e]ven if a state intends to advance a compelling government interest, we will not permit speech-restrictive measures when the state may remedy the problem by implementing or enforcing laws that do not infringe on speech." *IMDb.com*, 962 F.3d at 1125.

The law is not narrowly tailored three times over: First, Supreme Court precedent forecloses the state from punishing those who publish lawfully obtained facts of public interest to reinforce the government's interests in keeping its own confidences. Second, the statute is over-inclusive because its plain language reaches *any* speaker, not just those with an obligation to maintain a secret, and the State ignored obvious means of narrowing the law in manners that would protect journalists, publishers, and public commentators. Third,

1  it is under-inclusive because it exempts the government agencies and employees who *do*

2  have an obligation to prevent the release of government records.

  **i.    In reaching lawfully obtained information, the law crosses clear lines set forth by the Supreme Court.**

   The anti-dissemination statute cannot survive strict scrutiny because it empowers officials to sanction publication of lawfully obtained truthful information of public concern. Such regulation disregards the unbroken line of cases in which the Supreme Court repeatedly held that when a speaker "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information absent a need . . . of the highest order." *Bartnicki*, 532 U.S. at 527–28 (radio commentator's broadcast of a recording of a telephone call, which he knew was unlawfully recorded by someone else, was protected by the First Amendment because the commentator obtained it lawfully); *see also, e.g.*, *Worrell Newspapers of Ind.*, 739 F.2d at 1221–25 (statutory prohibition on disclosing the existence of a sealed indictment before the defendant is arrested violated the First Amendment as applied to the media); *supra* cases cited at p. 1. The dissemination of lawfully obtained information about sealed arrests—including Plaintiffs' intended speech—falls squarely within these cases.

   Plaintiffs obtained information about Blackman's sealed arrest lawfully by reading Jack Poulson's public report. (Decl. Volokh ¶ 14–15; Decl. LaRoe ¶ 9–11.) Poulson, too, obtained it lawfully. (Decl. Steinbaugh ¶¶ 10, 12; Ex. 6 at ¶¶ 44–45; Ex. 8 at ¶¶ 5–6.) Even if he had some indication his source had unlawfully obtained the report—which did not bear the mandatory stamp that would have indicated as much—the First Amendment protects its publication. *Bartnicki,* 532 U.S. at 528–30. Indeed, Blackman's own theory is that the San Francisco Police Department negligently shared the report in response to a public records request. (Decl. Steinbaugh ¶ 10, Ex. 6 at ¶¶ 44–46.) If so, the government is at fault—which may be why the San Francisco City Attorney is eager to deploy the anti-dissemination statute to put the horse back in the barn. *Fla. Star*, 491 U.S. at 534 (where government has "sensitive

1  information" in its custody, it must take steps to "forestall or mitigate the injury caused by
2  its release" short of penalizing publishers).

3      The information Blackman wants to be suppressed involves matters of public
4  concern. With respect to the underlying incident report, the "commission, and investigation,
5  of a violent crime which has been reported to the authorities" is a "matter of paramount
6  public import." *Fla. Star*, 491 U.S. at 537; *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469,
7  492 (1975) ("The commission of crime, prosecutions resulting from it, and judicial
8  proceedings arising from the prosecutions . . . are without question events of legitimate
9  concern to the public"). Blackman's arrest is of public concern not only because of his status
10 as a controversial technology industry executive widely covered in the press but also because
11 his arrest implicates his security clearance. So, too, are the circumstances of Blackman's
12 successful petition to seal the arrest report of legitimate public interest. *Briggs v. Eden*
13 *Council for Hope & Opportunity*, 969 P.2d 564, 571 (Cal. 1999) (every legal proceeding
14 "possesses some measure of 'public significance'"). And efforts by Blackman and the City
15 Attorney to suppress reporting about the arrest, including Blackman's lawsuit, are
16 independently matters of public concern.

17      **ii.    The statute is overinclusive, reaching beyond consumer**
              **reporting agencies and ignoring means to exempt publishers.**
18
19      The anti-dissemination statute is also not properly tailored because when "informa-
20 tion is entrusted to the government, a less drastic means than punishing truthful publication
    almost always exists for guarding against the dissemination of private facts." *Fla. Star*, 491
21 U.S. at 534. Here, there are obvious ways the Legislature could have written the law while
22 burdening less speech:[13]
23

24

25  _____
      [13] Though Plaintiffs do not concede that such narrower laws would be constitutional,
26  their potential availability shows that the current statute is unconstitutional. *Cf., e.g.*, *Wal-*
    *Mart Puerto Rico, Inc. v. Zaragoza-Gomez*, 834 F.3d 110, 127 n.16 (1st Cir. 2016) ("In listing
27  these possible alternatives, we do not decide that any of those particular alternatives are
    themselves sufficiently narrow to survive dormant Commerce Clause scrutiny. It suffices for
28  our purposes to say that the availability of those less restrictive alternatives invalidates the
    AMT in its current form.").

*Eliminating the ambiguous "relating to" language.* The statute is not only broad in *who* it restricts, but also in *what* they are prohibited from communicating. It prohibits not only the dissemination of particular documents but any information "relating" to them—a term so expansive it cannot be understood with reasonable clarity. *See San Diego Unified Sch. Dist. v. Yee*, 30 Cal. App. 5th 723, 733 (2018) (noting "broad" meaning of "relating to" as "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with") (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992)). That ambiguity compounds its chilling effect, requiring speakers to guess whether their comments might relate to a sealed arrest—and exemplifying why the statute is not narrowly tailored. For example, Volokh must guess whether writing about Blackman's "John Doe" lawsuit may trigger liability, even if he does not use Blackman's name, because the litigation "relates to" the sealed record. (Decl. Volokh ¶¶ 23–25.) FAC and LaRoe similarly must guess whether they can discuss the basis of Blackman's lawsuit or Blackman's censorship campaign in their public advocacy. (Decl. LaRoe ¶¶ 27–28, 30–31.)

*Exempting publishers, including journalists.* California's legislature frequently exempts people or entities defined in California Evidence Code Section 1070, which broadly protects people affiliated with media outlets, when it crafts statutes dealing with sensitive information.[14] It chose not to with this statute, instead leaving it to threaten journalists' right to report on lawfully obtained information without risk of liability under the Penal Code. Indeed, while Blackman can file a civil suit against a journalist who reported on his arrest, other media outlets and commentators—like Volokh—risk a civil penalty if they write about that *unsealed* lawsuit, because doing so may disclose information related to the sealed arrest.

*Limiting the penalty to authorized persons who disclose information to unauthorized persons.* An earlier version of the bill would have made it a misdemeanor

---

[14] *See, e.g.*, Cal. Gov't Code § 6208.1(b)(3) (in regulating the posting of addresses of victims of domestic violence, providing that the law "shall not apply to a person or entity defined in Section 1070 of the Evidence Code"); Cal. Gov't Code § 6218(b)(3) (same, with respect to information pertaining to reproductive health care providers); Cal. Lab. Code § 432.7(g)(3) (possession of criminal or juvenile records); Cal. Penal Code § 11143 (criminal history information).

offense for a "person who is authorized to have access to information relating to an expunged arrest [to] disseminate[] information relating to an expunged arrest to a person who is not authorized." (*See* Decl. Steinbaugh ¶ 15, Ex. 11 at 5 (S.B. No. 393, as introduced, at proposed § 851.867(g)(1))). This narrowing language, although imperfect,[15] would have allowed the State to insist that its agencies and employees maintain secrecy *without* obligating every member of the public to do the same.[16] Yet the State chose not to adopt that narrower version.

*Including an intent requirement.* The statute could also be narrowed by requiring intent to disseminate the information for unlawful purposes, like identity theft or extortion. That would go far in providing breathing space for protected speech like publishing lawfully obtained sealed arrest information as part of the news, commentary, criticism, scholarship, and a host of other lawful purposes. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (requiring a showing of purposeful intent in incitement cases); *see also Counterman v. Colorado*, 600 U.S. 66, 74–82 (2023) (requiring recklessness standard for "true threats" statutes and explaining why requiring subjective intent helps preserves First Amendment breathing space). But instead, the law ensnares all those purposes, strangling the First Amendment and cementing why it fails strict scrutiny.

*Regulating discrimination based on arrest records.* Finally, if California is concerned with use of arrest records to deny employment or housing, it can prohibit discrimination on that basis. California, indeed, already does so to some extent, demonstrating that it can accomplish these goals without burdening speech. *See, e.g.*, Cal. Gov't Code § 12952(a)(3)(A)

---

[15] The law would be clearer if it limited its application to persons authorized to have access by virtue of their employment by a law-enforcement agency.

[16] The legislative history also shows that lawmakers were concerned with the need to deter "consumer reporting agencies," which are "generally" how "information of arrests . . . finds its way" into the public, from continuing to disclose information about sealed arrests. (Decl. Steinbaugh ¶ 14, Ex. 10 at 9.) The statute provides a definition of these agencies, and the Legislature could have simply barred a "[c]riminal history provider" from disseminating sealed records—a far narrower burden than prohibiting *any* "person or entity" from sharing truthful information. Cal. Penal Code § 851.92(c), (d)(3). But even this narrower measure would not survive First Amendment scrutiny. *See Sorrell*, 564 U.S. at 568–577 (striking down limits on information the speaker already possesses.)

(limiting employers' consideration of an "[a]rrest not followed by conviction" in hiring decisions); 2 Cal. Code Regs. 12264, *et seq.* (regulations on the use of criminal history in housing).

**iii.    The statute is underinclusive because it exempts those responsible for safeguarding sealed records.**

The anti-dissemination statute is also not properly tailored because it under-inclusively exempts the very people most likely to negligently (or purposefully) share sealed arrest information—government employees within the criminal justice system—"rais[ing] serious doubts" whether the law serves its asserted objective. *Fla. Star*, 491 U.S. at 540; *see also Republican Party v. White*, 536 U.S. 765, 780 (2002) (noting a "law cannot be regarded as protecting an interest of the highest order" when "it leaves appreciable damage to that supposedly vital interest unprohibited").

Specifically, the statute exempts from its civil penalty every "criminal justice agency," which it defines broadly to include law-enforcement agencies and individual officers, relieving them of a strong incentive to avoid mishandling sealed arrest records. Cal. Penal Code §§ 851.92(c), (d)(4). The government can insist that its employees maintain the confidentiality of sensitive records, and it can provide a civil remedy to persons affected when its employees fail to do so, but it cannot "enhance the guarantee of confidentiality" by burdening the public's speech. *Landmark Commc'ns*, 435 U.S. at 841.

Because there are obvious means of narrowing the anti-dissemination statute to avoid burdening protected speech, Defendants cannot satisfy strict scrutiny. Both as applied to Plaintiffs and on its face as extended to disseminating lawfully obtained information about sealed arrests, the anti-dissemination statute violates the First Amendment.

**II.    Plaintiffs Are Experiencing Irreparable Harm in the Absence of Preliminary Injunctive Relief.**

Without a preliminary injunction, Plaintiffs are experiencing irreparable harm. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Because a plaintiff need only show a "colorable" claim, "irreparable harm is relatively easy to establish in a First

Amendment case." *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019). Even just the "threat of enforcement" resulting in a "chill on . . . free speech rights . . . constitutes irreparable harm." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). Here, the statute and the City Attorney's threats have only heightened that chill. They are deterring Plaintiffs from commenting on or writing about Blackman's apparent (and actual) efforts to suppress public discussion of the arrest in the same manner they would discuss the dispute in the statute's absence. (Decl. LaRoe ¶¶ 24–32; Decl. Volokh ¶¶ 22–27.) A preliminary injunction is warranted to remedy that irreparable loss of constitutional rights.

### III. Injunctive Relief Serves the Public Interest and the Balance of Harms Tips in Plaintiffs' Favor.

The remaining factors similarly support grant of a preliminary injunction. When "the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—'merge.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Because Plaintiffs raise "serious First Amendment questions" about the anti-dissemination statute, "that alone compels a finding that the balance of hardships tips sharply in [their] favor." *Meinecke*, 99 F.4th at 526. And "it is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), as "all citizens have a stake in upholding the Constitution," *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005).

Additionally, given the minimal impact on Defendants, the Court should not require a bond. The Court has discretion "as to the amount of security required, *if any*," under Federal Rule of Civil Procedure 65(c), and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining [their] conduct." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation and quotation marks omitted). Courts regularly waive the bond requirement in free speech cases because

requiring a bond "would have a negative impact" on constitutional rights. *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F.Supp. 719, 738 (C.D. Cal. 1997) (citation omitted).

<u>**CONCLUSION**</u>

The Court should grant a preliminary injunction prohibiting Defendants from enforcing California Penal Code Section 851.92(c) against Plaintiffs and against persons and entities who publish lawfully obtained information about sealed arrests.

DATED: November 25, 2024                    Respectfully submitted,

                                            By: /s/ Adam Steinbaugh

JT Morris, Tex. Bar No. 24094444*             Adam Steinbaugh, Cal. Bar No. 304829
Zachary Silver, D.C. Bar No. 1742271*         FOUNDATION FOR INDIVIDUAL
FOUNDATION FOR INDIVIDUAL                        RIGHTS & EXPRESSION
   RIGHTS & EXPRESSION                         510 Walnut Street, Suite 900
700 Pennsylvania Ave., SE, Suite 340          Philadelphia, PA 19106
Washington, D.C. 20003                        Tel:     (215) 717-3473
Tel:     (215) 717-3473                       Cell:    (562) 686-6990
Fax:     (215) 717-3440                       Fax:     (215) 717-3440
Email:   jt.morris@thefire.org                Email:   adam@thefire.org
Email:   zach.silver@thefire.org

                                              David Loy, Cal. Bar No. 229235
                                              David Snyder, Cal. Bar No. 262001
                                              FIRST AMENDMENT COALITION
                                              534 4th Street, Suite B
                                              San Rafael, CA 94901-3334
                                              Tel:     (415) 460-5060
                                              Email:   dloy@firstamendmentcoalition.org
                                              Email:   dloy@firstamendmentcoalition.org

                                              Attorneys for Plaintiffs
                                              FIRST AMENDMENT
                                              COALITION, VIRGINIA LAROE,
                                              and EUGENE VOLOKH

                                              * Pro hac vice *application pending*.